*New-Haven,*
July, 1850.

Mix
*v.*
Cowles.

*The following dissenting opinion of Judge* ELLSWORTH, *in the case of* Mix *&· al. v.* Cowles *&· al., ante* 420.—427. *was mislaid, (being enveloped in another paper,) at the time the MS. was sent to the printer, and was, for that reason, omitted in the report of that case; and although it was soon afterwards discovered, it was thought, that as it could not be inserted where it belonged, the best way would be to give it a place after the other cases of the same year. It is accordingly inserted here.*

### Mix & al. *v.* Cowles & al.

ELLSWORTH, J. I cannot concur in this opinion of my brethren. It is with great diffidence that I dissent. Nor would I give my views in detail, did I not believe that a dangerous precedent is about to be established. Unless I am mistaken in the features of this case, it cannot be reconciled with numerous adjudications of this court.

*Brown,* the mortgagor, carrying on business in *Meriden,* wished to purchase goods in *New-Haven,* as he might need, from *time* to *time.* The plaintiffs expressed a willingness to open an account with him, but as they doubted his credit, and the account might run indefinitely, he was to keep them secure for *any* future balance, to an amount not exceeding 200 dollars, to which extent they would trade. On this footing, the parties concluded to open an account. Thereupon *Brown* gives the plaintiffs his note of hand, for 200 dollars, and secures it, by mortgaging the land in question, " *as a basis for credit.*" *After* this, the account is opened, and a bill of goods of about 100 dollars, is taken, the same day, and with the exception of 3 dollars, no more goods are taken, for some months; when *Brown* makes a payment of 67 dollars, and takes more goods. So the account runs on, varying, from time to time, as payments are made and credited, and when the 200 dollar note falls due, a *new* note is given in lieu thereof; which latter note, when due, is taken up by *Brown,* who borrows of the plaintiffs therefor, in part, 116 dollars, 12 cents. Long after this, when *Brown* comes to sell the premises to Mrs. *Cowles,* in order to ensure a perfect title, he hands her

*New-Haven,*
*July, 1850.*

Mix
*v.*
Cowles.

the said second note, then in his hands, *paid* and *extinguished,* as aforesaid.

Now, in the first place, my conclusion from the facts found, is, that this is nothing more than the common case of an arrangement for a *future running account,* as shall be mutually convenient; or, in other words, whenever the parties are agreed, from *time* to *time,* upon the goods to be taken, the price and credit. *Brown* does not actually bind himself to take any goods at all, much less at any particular time, or amount, or price, or credit. Nor do the plaintiffs enter into any *legal obligation* to sell him goods; not to say, there is no *written* promise to do it, there is none at all. They were not bound to have on hand the particular goods asked for; they might ask a higher price and a shorter credit than he would consent to; and he might prefer trading elsewhere. So they might have stopped business entirely. Hence there is no absolute compact on either side; nothing in the shape of a *sale* or *debt;* nothing, indeed, more than a preliminary arrangement to trade, as the parties shall agree. Neither felt bound beyond their convenience, except that nothing more was expected to be said about the *solvency* of *Brown,* if the balance did not exceed 200 dollars during the trade, the mortgage securing that amount. True, both parties *expected* to trade with each other; but there was nothing more than an expectation, and certainly nothing which the law would *enforce.* Now, this expectation is converted into a perfect obligation—*a sale—a debt,* and a note of hand is given, assuming the utmost limit of that expectation as the amount of the true indebtedness, while every thing is *optional* and *contingent,* as in running accounts generally.

If in such a case, *Brown* can lay an absolute debt on his farm, to the extent of this expectation, what becomes of the statute, requiring incumbrances on real estate, to appear truly on the records of the town? And what, of the numerous decisions of this court, none of which allow less to appear than the *amount* and *nature* of the indebtedness intended to be secured. In *North* v. *Belden,* Ch. J. *Williams,* in giving the opinion of the court, says: "One principle seems to be definitely settled, that the real nature of the transaction, so far as it can be disclosed, must appear on the record, with reasonable certainty; and if the deed does not actually give

notice of any condition, or other circumstance, which might be important, it should, at least, point out a track, which the enquirer may pursue, to obtain it. Thus, it has been considered as settled, long since, that if an absolute deed is given with intent to secure a debt, such deed will be void, as respects *bona fide* creditors, as it does not disclose the real nature of the transaction. It places the parties in a false position, as it respects the public. It holds out the grantee for the real owner, when in fact the grantor is, or may be, the owner. It tends to lull the creditors of both parties, (as the case may be,) into false security, and to conceal from them the real condition of their debtors." So in *Sanford* v. *Wheeler*, Ch. J. *Church*, in giving the opinion of the court, says: " But what have we here? A mortgage given to secure the payment of a note of 2,601 dollars, 16 cents, due from the mortgagor to the mortgagee, payable *absolutely* and unconditionally, and on demand; and without any intimation that any other than an absolute and *bona fide* debt, of the description mentioned, was in the contemplation of the parties."

Suppose it is mutually agreed between a person in *Hartford*, and merchants in *New-York*, that they will open an account, and carry on trade with each other, but the balance must never exceed 5000 dollars. Is this any thing more than an arrangement to trade, as the parties shall agree? And can the trader in *Hartford*, at once, give his promissory note for 5000 dollars, payable in ninety days, and secure it against his *bona fide* creditors, by mortgaging his farm? If he can, then hereafter an honest intention is all that will be required for incumbering one's estate, to its full value.

In no case, from *Griswold* & al. v. *Pettibone*, down to *Merrills* v. *Swift*, has a less rigid rule been allowed, than that already stated, *viz.*, that the condition of the deed shall show the *nature* and the *amount* of the obligation or indebtedness. Do these appear here? Not at all. Does it appear that this note is a mere *" basis of credit?"* Quite otherwise. Who will say, this record gives correct information? It declarés there is a *debt* of just 200 dollars, *due* in *ninety days* from date, when perhaps there is not a dollar due. Nor is the enquirer put upon a "track," to receive further information; his eyes rather are filled with dust, to stop enquiry. The fact is, the record is *all false ;* and it must be so, while

an absolute note may be given to secure the balance of a future account, shifting from *time* to *time*, or perhaps not commencing at all.

Let me ask, if a person can give a present note and mortgage for future loans, *as* and *if* the sums shall be wanted from time to time, and the lender shall have the money by him? Nor would his *promise* so to loan the money, *if* wanted, make any difference. In the mean time, how utterly untrue and deceptive is the record? The borrower may not call for the money; and if he does, he may not retain it any time; he does not obligate himself to take it, or to keep it. The mortgagee may have failed, before lending the money—any part, or the whole of it; he may have removed from the state, or died; he may refuse to do as was expected, or as was agreed to be done. All this while, the mortgagor's farm *appears* to be under a heavy debt, which deceives and defrauds creditors. In *Griswold* & al. v. *Pettibone*, the court held a mortgage to secure " *all future indorsements*," was void as to creditors, though this was *stated* in the deed. Here, it is not *stated* even, but the contrary. The language of the court in *North* v. *Belden*, when speaking of a promise to do future things, is exceedingly appropriate : " Consequently, a person may convey all his estate to a friend, who shall *promise bona fide* to indorse for him, and these indorsements may fluctuate from time to time, in such a manner, that no one can tell the state of the property, except as the parties may choose to disclose it; and thus the real state of the title, instead of appearing upon the record, could only be found in the memory of the parties."

But it is said, at all events, the mortgage is good for the first bill of goods; for that is a part of the transaction. Were this indeed so, it would not render proper a judgment for the whole indebtedness. But of what transaction, I ask? Why, the giving of an absolute note for a future contingent account; which cannot be done, to affect *bona fide* creditors. The *note* is the thing objected to, not the bill of goods—that is well enough—but it does not reach the difficulty, since the note is given for double the debt, and *any future debt*, or in analogy to the case last cited, for any " future indorsements."

Besides, I see no difference, whether the first bill of goods purchased, was purchased on the same, or any other day,

after the note was given and secured. It was *after* it was given, and that is enough; it was a part of the *future credit.*

It is again said, Mrs. *Cowles* has no better right than *Brown* himself; for she is not a purchaser—she paid nothing. Why not? *Brown* owed her 1200 dollars; and she took for this debt, a clear title to the land in question, in *payment.* The land belonged to *Brown;* and why could he not *pay* the debt *in land?* Her having a lien on it makes no difference.

So too, before *Brown* sold to Mrs. *Cowles,* he took up and *cancelled* the second, the renewal note *himself,* and handed it to Mrs. *Cowles,* as cancelled, to assure her the land was free and clear. Had she not been satisfied that it was so, she would not have given up her debt, or taken the farm in payment.

Decree reversed,

ELLSWORTH, J. dissenting.